794 A.2d 654

**STATE of Maryland**

v.

**Stephen Craig JOHNSON.**

**No. 28, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

March 27, 2002.

Diane E. Keller, Assistant Attorney General (J. Joseph Curram, Jr., Attorney General, Baltimore, and Sandra A.

O'Connor, State's Attorney for Baltimore County of Towson, on the brief), for appellant.

Janis R. Harvey (Semmes, Bowen & Semmes, on the brief), Baltimore, for appellee.

Argued before DAVIS, SONNER, ROBERT L. KARWACKI, (retired, specially assigned) JJ.

SONNER, Judge.

In this appeal, we return to a tragic murder case. The Circuit Court for Baltimore County convicted Stephen Craig Johnson of the murder of his infant son in 1984, and we affirmed the conviction on direct appeal. About fifteen years later, Johnson filed for post-conviction relief, asserting that his trial counsel was substandard because he withdrew Johnson's insanity plea and pursued only a plea of not guilty. The circuit court then ordered a partial new trial on the issue of Johnson's sanity. We affirm that judgment because trial counsel inadequately investigated the insanity defense, which led him to withdraw it prematurely, and that error prejudiced Johnson's case.

## I. Background

### December 25, 1983

We recounted the facts of this murder on direct appeal as follows:

The record below paints a vivid picture of the tragedy that occurred on Christmas Day of 1983. Carla Johnson, the appellant's wife, testified that she had known the appellant for seven years and had been married to him for three years. She and the appellant had one child, Stephen Craig Johnson, Jr., 13 months of age at the time of his death. Mrs. Johnson testified that the appellant had been a loving and caring husband and father, but that he also had a long history of drug abuse. The appellant had in fact taken phencyclidine (PCP) and other drugs at a party in their home on December 23, 1983.

On Christmas evening Mrs. Johnson, the appellant and their son went to the appellant's mother's house for dinner. Mrs. Johnson testified that she did not recall the appellant partaking of alcoholic beverages or drugs at any time that day. According to Mrs. Johnson, the appellant seemed fine as they drove home in his truck, and she noticed nothing unusual. Upon their arrival at home sometime after 7:00 p.m., the appellant opened the door of the truck for his wife, and she carried their sleeping son into the house where she laid him on a bed.

Mrs. Johnson and the appellant then went into the living room. She told the appellant that he was working too hard and needed to relax. A short time later the appellant stated that he could call Ronald Reagan, if he wanted to. When his wife told him that he would probably be put on a list as a potential threat, the appellant responded that he was a potential threat. Mrs. Johnson thought nothing of this comment, however, because her husband appeared normal to her at that time. A few minutes later the appellant told her he was going to stop using drugs. He then asked his wife to feel his heart, which was beating rapidly. He looked very frightened.

Mrs. Johnson testified that, immediately after this conversation with her husband, the following occurred:

> As far as I can recall, he just, it just seemed like the next thing I know, he was in the bedroom grabbing our son off the bed. And I ran behind him, and when I got in there he already had ahold of him and he was squeezing him real tight, and it was almost as if he thought he was protecting him from me or something. And I kept saying, "Steve, please give him to me. Please give him to me." And I was trying to pry his fingers loose, and then he said that Stephen [Stephen, Jr., the son] was Jesus Christ reborn through us and that he had to die for everybody's sins. And then I just panicked. I can remember, I slammed him in the face and it was like it didn't even phase him. And I said, "I'm calling your mother," and I ran in to the living room and I had the

phone, and I was dialing, but it wasn't working right. And he ran right behind me, and I wasn't sure if he was not going to let me use the phone or what. And I just threw that phone down and I ran in to the living room, I mean the kitchen, and I got the phone, and we had one button dialing. And I dialed his mother's number and the phone, he went to reach for it or it ended up on the floor, and I bent over to get it, and he said, "Come on down here and die with us, Mom." And I was screaming in the background, "Please, quick, please, quick." And then from there he went over and he was standing in the corner by our cabinet. And I was standing in front of him and I was still trying to get him to let me have Stephen. And I, I could see that he was getting in the drawer and he was getting a knife. And I knew that something had hit my back, but I really wasn't sure. I mean, I knew he had a knife, but I was thinking he can't have a knife, he just can't, this isn't real. And then I, I just thought I got to get help, and I ran. And that's when I ran out of the house to the neighbor's.

Mrs. Johnson testified that about 20 to 25 minutes had passed between the time of their arrival at home and the time she ran out of the house. As a result of the attack upon her, Mrs. Johnson sustained lacerations across the back of her left shoulder blade.

After waiting a few minutes for Mrs. Johnson to calm down, her neighbors called the police. Craig Coleman, Paramedic Field Coordinator for the Baltimore County Fire Department, testified that at approximately 7:34 p.m. he received a call to respond to the Johnson residence. Upon his arrival he saw the appellant at the top of the driveway holding the limp body of a child. The appellant waved to Coleman and told him to come and help him, that he needed help badly. When Coleman approached the house, the appellant ran inside. Coleman called the appellant's name, and he responded, "Come on, I'm in here, I need help." Coleman told the appellant that he could not go into the house; that the appellant had to come out and bring him the

baby. The appellant responded, "There is nothing you can do, the baby is dead, I have killed the baby, there is nothing you can do." Coleman made repeated requests to the appellant to bring the baby out, meeting with the same response. The appellant stated that he was sorry for what he had done, and that he wanted to talk to the Lord. Coleman told the appellant that the Lord would not help him as long as he had the baby; he again asked the appellant to bring him the baby. The appellant repeated that he wanted to talk to the Lord. Coleman asked the appellant if he knew the Lord's Prayer. The appellant recited the Lord's Prayer. Soon thereafter the telephone rang. Coleman heard the appellant say, "I need your help and I want you to come over here now. I have done something wrong and I need your help. Please hurry and come over now." After the appellant hung up the phone, Coleman again requested that he release the baby. Coleman asked him, "Steve, do you take drugs?" and the appellant said, "yes." Coleman told the appellant that he could get help for the drugs, but he had to bring Coleman the baby. The appellant then brought the baby out of the house. Coleman saw at that point that the baby was dead. He had been stabbed and decapitated.

Coleman stated on cross-examination that, in his opinion based on his experience as a paramedic, the appellant was acting no differently than other people he had seen under those circumstances, and that he heard no hollering, screaming or raising of voices during the appellant's arrest.

\* \* \*

The police reports of Officers Mueller, Imke, and Baumiller of the Baltimore County Police Department, were admitted as defense exhibits. The reports stated that, after the officers arrived on the scene, they heard the appellant shouting, "Jesus, take my baby." One of the reports stated that the appellant growled like an animal when the paramedic tried to take the baby's body from him. Another

report stated that the appellant was talking incoherently, saying he did not want help but he wanted his mother.

*Johnson v. State,* No. 1031, Sept. Term, 1984 (filed April 17, 1985).

Police arrested Johnson and transported him to Baltimore County General Hospital. He appeared calm and coherent, although PCP was found in his urine. Johnson then spent December 29, 1983 through January 13, 1984 at Clifton T. Perkins Hospital Center. He was placed on various anti-psychotic drugs throughout this period.

### *Porreca v. State*

At this point, we detour from Johnson's case and discuss *Porreca v. State,* 49 Md.App. 522, 433 A.2d 1204 (1981), an attempted murder that occurred four years earlier, which involved a strikingly similar assault. In 1979, Michael Porreca stabbed his roommate with a knife, while making bizarre statements about the victim's soul. Like Johnson, Porreca had a long history of drug abuse and had taken PCP within days before the attack. He defended the attempted murder charge with a plea of not guilty by reason of insanity, as produced by the PCP ingestion. The law at Porreca's trial was that, upon the introduction of sufficient evidence questioning the defendant's sanity at the time of the crime, a burden shifted to the State to prove, beyond a reasonable doubt, that the defendant was not, in fact, insane. *See Bradford v. State,* 234 Md. 505, 513, 200 A.2d 150 (1964). Since then, of course, the law has changed to the effect that a defendant who enters a plea of not criminally responsible bears the burden of proving the insanity by a preponderance of the evidence. *See* Md.Code (2001), Crim. Procedure, § 3–110(b); *Anderson v. Dep't of Health and Mental Hygiene,* 310 Md. 217, 220–22, 528 A.2d 904 (1987).

Porreca attempted to meet his burden of production for raising an insanity defense with the testimony of Dr. Brian Crowley, a psychiatrist.

Dr. Crowley indicated that PCP was capable of causing four or five different categories of mental disorders and that the drug produced an organic brain syndrome which was sometimes reversible and sometimes not. He also indicated that PCP could produce a psychosis of fairly long duration, with the user suffering the effects weeks or months after use of the drug ceased. The psychiatrist testified that manifestations of the appellant's psychosis had appeared in November 1979, at least one month prior to the assault on Miss Klieforth, and had continued for three to six months thereafter. He stated that the appellant was not continuously psychotic, having lucid intervals during this time, and that as the effects of the drugs abated, the psychotic symptoms diminished. Dr. Crowley agreed that the appellant was sane prior to beginning his use of PCP and other drugs and again after the effects of the drugs wore off, which was some two to four months after the attack; he also stated that the psychosis was the result of appellant's use of intoxicants and that he would not have assaulted Miss Klieforth had he not been using PCP.

*Porreca,* 49 Md.App. at 525, 433 A.2d 1204.

The trial court ruled that Porreca failed to meet his burden of production because he had ingested the drugs voluntarily and was sane before taking the PCP and after it wore off. *Id.* It relied upon *Parker v. State,* 7 Md.App. 167, 254 A.2d 381 (1969), in which this Court held that an insanity defense was unavailable to a defendant who committed a crime under the influence of a drunken bout. The court convicted Porreca of attempted murder, and sentenced him to twenty years in prison.

We reversed the trial court in *Porreca,* emphasizing that the ingestion of drugs could cause either temporary insanity or settled insanity. The former results from "the present consumption of intoxicants," and persists "only so long as the individual was under the direct influence of the intoxicant." *Id.* at 528, 466 A.2d 550. A settled insanity, however, results from "continued or persistent use," and exists "even after the chemical agent was no longer present in the individual's blood

stream." *Id.* Whereas a temporary insanity is not a recognized defense, a settled insanity may be, and since we read Dr. Crowley's testimony as diagnosing a settled insanity, we remanded the case for a new trial.[1] While "we [did] not want a criminal to escape punishment by the simple expedient of getting drunk first, neither [did] we want to punish anyone who [was] legally insane, even though the cause of [the] insanity [was] a long-term use of drugs or alcohol." *Id.* at 529, 466 A.2d 550.

Our opinion followed a similar case from the California Supreme Court, *People v. Kelly*, 10 Cal.3d 565, 111 Cal.Rptr. 171, 516 P.2d 875 (1973), and was adopted in turn by Michigan in *People v. Conrad*, 148 Mich.App. 433, 385 N.W.2d 277 (1986), and Massachusetts in *Commonwealth v. Herd*, 413 Mass. 834, 604 N.E.2d 1294 (1992). *Porreca* was filed in September 1981, about two years before Johnson committed his murder. Naturally, it was important precedent for Johnson's case and became a chief subject of the post-conviction proceedings.

### *Pre–Trial*

On January 17, 1984, the State charged Johnson with first-degree murder, assault with intent to murder, possession of marijuana, and possession of cocaine. A week later, Nathan Stern, a lawyer of twenty-five years, "practicing mainly criminal law," entered his appearance as Johnson's attorney. On February 14, 1984, Johnson filed a plea of not guilty by reason of insanity, now known as a plea of not criminally responsible ("NCR"). Stern then successfully moved to have Johnson evaluated by Dr. Neal Blumberg, a psychiatrist in private practice, who also served as Director of Forensic Evaluation at Perkins Hospital. Dr. Blumberg met with Johnson on February 22, 1984, and subsequently interviewed his mother, brother, and wife. Just two days after the doctor's meeting

---

1. On remand, Porreca pleaded guilty to assault and battery and was sentenced to ten years' imprisonment, eight and one-half years of which were suspended subject to supervised probation. *Porreca v. State*, 56 Md.App. 63, 65, 466 A.2d 550 (1983).

with Johnson, Stern's office withdrew the NCR plea and filed an amended plea of not guilty. That left Johnson proceeding to trial with the singular tactic of lessening the first-degree murder charge by defeating the elements of specific intent and premeditation with evidence of voluntary intoxication.

Apparently, Dr. Blumberg continued to work on Johnson's case after withdrawal of the plea. He submitted a report to Stern in April 1984 that included a review of Johnson's medical, family, and personal history, as well as the following evaluation:

> [I]t is my opinion that at the time of the alleged offense on December 25, 1983, Stephen Johnson was suffering from a PCP mixed organic mental disorder, a mixed substance abuse disorder and a mixed personality disorder. As noted above, the defendant demonstrated a wide variety of psychotic symptoms involving delirium and delusions which, in my opinion, were directly related to his most recent abuse of phencyclidine. This type of bizarre behavior and ideation is frequently associated with this drug in particular. Furthermore, his criminal behavior, in my opinion, was the direct result of his believing that his delusions were, in fact, real.

* * *

> It is my further opinion that as a result of Mr. Johnson's voluntary ingestion of phencyclidine around the time of the offense, that he lacked substantial capacity to appreciate the criminality of his conduct and conform his conduct to the requirements of the law. However, since Mr. Johnson's criminal behavior was the direct result of his voluntary drug ingestion, in my opinion he, nevertheless, is criminally responsible for his misconduct.

> Furthermore, at the time of my examination, Mr. Johnson was competent to stand trial, in that he understood the nature and the object of the proceedings against him and

could assist in his defense.[2]

## *Trial*

The circuit court tried Johnson in a one-day bench trial on April 16, 1984. The most significant testimony was given by Dr. Blumberg, who was the only defense witness. The doctor reiterated his belief that the defendant suffered from "a PCP mixed organic mental disorder." Stern then asked whether Johnson appreciated the criminality of his conduct, which prompted the State to object that "a psychiatrist [could not] render an opinion on the ultimate factual issue." Stern defended that Dr. Blumberg merely sought to repeat the conclusion in his report that Johnson was competent to stand trial. Then, as an afterthought, Stern argued that Dr. Blumberg would also testify "that [Johnson] was not insane at the time." Apparently, he did not intend to explore Dr. Blumberg's conclusions as to the effect of the PCP on Johnson or how *Porreca* factored into the case.

The State's objection prompted the court to ask, "Are we going to have a not guilty plea by reason of insanity?" Stern answered in the negative and moved on to the aforementioned discussion. The court eventually overruled the objection, and Dr. Blumberg concluded his examination by repeating his written conclusion that Johnson lacked "substantial capacity to both appreciate the criminality of his conduct and conform his conduct to the requirements of law."

On cross-examination, the State attempted to solidify Dr. Blumberg's opinion as to whether Johnson "[met] the legal insanity requirements." Dr. Blumberg, however, declined to answer a simple "yes" or "no", explaining instead:

---

**2.** Per Dr. Blumberg's suggestion, Johnson was also scheduled to be evaluated by Dr. David Shapiro, an "independent" psychologist. This meeting appears to have taken place in late March or early April 1984, although we have not located any record of the evaluation. From post-conviction testimony, we discern only that Dr. Shapiro "ruled out any kind of underlying psychotic or organic brain damage."

[I]f there was no PCP, if his mental state in my opinion was not the result of PCP intoxication or PCP psychosis, [then] he would have qualified. [as legally insane]. However, the issue of his voluntarily taking the drugs makes it, in terms of the legal issue, that he would be responsible. However, the mental state alone would have qualified him, in my opinion, for the criteria of an insanity defense.

The State then raised *Porreca*, and Dr. Blumberg asserted that Johnson had not suffered from "a settled, fixed, or permanent form of insanity or mental illness." The doctor finished his testimony by answering a series of questions from the court concerning the difference between a delusion caused by drug ingestion, and one caused by a mental disorder, such as schizophrenia. Dr. Blumberg defined Johnson's disorder as "PCP psychosis."

Rounding out the testimony at trial were the examinations of the State's three witnesses: Carla Johnson, the paramedic who arrived at the scene of the murder, and the detective who responded to the scene. The defense also admitted into evidence the police reports of three apprehending officers. Stern elicited from Mrs. Johnson that her husband had ingested PCP two days before the murder, and he directed the court's attention to portions of the police reports detailing Johnson's bizarre behavior. Piecing those facts together with Dr. Blumberg's testimony, he argued in closing that, at the time of the murder, Johnson suffered "a mental condition because of his ingestion of PCP" that precluded him from forming "an intent and premeditation of killing a child."

The State began its closing argument with the emphatic assertion: "[T]his is not a case of insanity." It argued that Johnson's mental capacity did not implicate "the *Porreca*-type situation" because "[t]here was no subtle delusion, no pre-psychotic condition." Turning then to Johnson's capacity to premeditate the crime, the State pressed that there was no evidence that the PCP ingestion divested Johnson of all cognition. It also argued that ingestion of PCP, a controlled substance, should be treated differently from alcohol consumption, the historic ingredient in a voluntary intoxication defense.

The court convicted Johnson of first-degree murder and the lesser three charges, ruling:

> I conclude from the evidence in this case that the defendant intended to kill and did so with premeditation and that it was a willful and deliberate act of the defendant at the time of the killing. I further conclude from the evidence that at the time of the offense the defendant's state of mind, his motivation and intentions were affected by the voluntary ingestion of an illegal drug or drugs, primarily PCP.

> In the Court's opinion, the defendant was not suffering from a settled or fixed insanity. And as I interpret the law in this case, if a person voluntarily takes a mind-altering drug, he is responsible for his conduct, which is deliberately, willfully and premeditatedly undertaken while under the influence of that drug, and that person will be criminally responsible for his conduct under such conditions.

The court sentenced Johnson to life imprisonment, with all but fifty years suspended for the murder, and shorter, concurrent sentences for the assault and drug convictions.

Stern then moved for a new trial on the ground that the court disregarded the undisputed testimony of Dr. Blumberg, which he characterized: "His conclusion was that the defendant was legally insane at the time of the offense due to PCP psychosis. However, due to his voluntary ingestion, he could not be found insane." In closing, Stern also noted that both he and the prosecutor were "shocked" by the first-degree conviction. The court denied the motion, reiterating its belief that Johnson was "perfectly sane" at the time of the crime.

### Direct Appeal

On direct appeal, *Johnson v. State*, No. 1031, Sept. Term, 1984 (filed April 17, 1985), Johnson challenged the sufficiency of the evidence for the murder conviction. Specifically, he argued that his history of drug abuse, coupled with Dr. Blumberg's testimony, refuted the requisite element of premeditation. We were unpersuaded, given the deferential standard of appellate review on such matters. Johnson next argued that he was entitled to a verdict of not criminally

responsible, but we quickly disposed of the claim by noting he had withdrawn the NCR plea, so it was not before the trial court. In a footnote, we urged Johnson to pursue the NCR claim in post-conviction proceedings, and he heeded the advice in February 1998.

### *Post–Conviction*

Johnson alleged in his petition for post-conviction that Stern withdrew the NCR defense prematurely, thereby preventing him "from presenting a potentially meritorious defense." [3] He argued that his case mirrored the facts of *Porreca,* and, by abandoning the line of defense sanctioned in that case, Stern left him admitting a heinous crime, but scrambling to redefine it as second-degree murder. The State's response was, "[P]resented with a very difficult case from an emotional standpoint, counsel did a very effective job in representing Stephen Johnson." The circuit court held a post-conviction hearing in February 1999, at which Johnson called to the stand, *inter alia,* Stern, Johnson's mother, Johnson's brother, a forensic psychiatrist named Dr. Michael Spodak, and a criminal defense attorney named Richard Karceski. He did not call Dr. Blumberg.

Stern testified that he became involved in the case through his associate, Larry B. Litt. Apparently, Litt was a friend of Johnson's family, and although he spoke with the family about the case and even signed some pleadings, he thought it best that Stern serve as lead counsel in the case. Stern recalled the bizarre circumstances of the murder and remembered retrieving police reports and hospital records related to the case. Beyond that, however, his memory failed him, which

---

**3.** Johnson also alleged that Stern's representation was ineffective because his associate and nephew, Larry Litt, represented Johnson's wife in selling the family's business during the time of the criminal proceedings. The circuit court found no evidence of a conflict, and Johnson has not appealed that judgment. Johnson further alleged that Governor Glendening's executive order of September 21, 1995, denying parole to persons serving life sentences, amounted to an *ex post facto* law. *Lomax v. Warden,* 356 Md. 569, 741 A.2d 476 (1999), disposed of that claim.

frustrated Johnson's post-conviction counsel's repeated attempts to pin down the sequence of events leading to the withdrawal of the NCR plea. Stern could not recall exactly when he spoke with Dr. Blumberg, although he was "sure" that he had spoken with him either on February 22, 1984, the day of the psychiatric interview, or the next day. Nor could Stern remember speaking with Johnson about withdrawing the plea, although he "assumed" he had done so, in line with his practice of discussing all filed motions with clients.

Ultimately, Stern explained his reason for withdrawing the plea:

Dr. Blumberg was not going, in my opinion, to be helpful as to that motion of whether it came under NCR.

Also in the police reports I remember, and in talking to Mr. Johnson about his background, the fact that he worked every day. He had no problems going to work. He had a relationship with his wife. The fact that the police, the hospital report indicated that after a couple hours or sometime, but that evening, that morning, he discussed what had happened to the best of his knowledge. That he wasn't incoherent, that it indicated that there was PCP in his system at the time. All that, along with what Dr. Blumberg had told me, and the other doctor—I think at that point, it was decided that we could never sustain the plea of insanity, that in my opinion, the best bet, and the best thing for Mr. Johnson, was to proceed and try in getting found not guilty of first-degree murder.

Apparently, Stern believed the case was a "slam-dunk" second-degree murder.

Johnson's post-conviction attorney then questioned Johnson's mother and brother about his mental history, and their assistance in trial preparation. Each of them relayed stories, occurring years before the murder, in which Johnson acted strangely. His mother recollected an incident from the 1970's, in which her son told her "the world was coming to an end—the sky was all red and God was coming." She also recalled an episode in which her son exclaimed mysteriously, "[T]hey

were going to kill me." Johnson's mother believed that drugs could have precipitated those incidents, and Johnson's brother explained that Johnson was "[j]ust not himself" when he used drugs. Both family members testified that they did not volunteer this information to Stern or Dr. Blumberg, nor did the professionals solicit it from them.

Dr. Spodak [4] began his testimony by distinguishing between two types of reactions to PCP ingestion: acute intoxication and PCP psychosis. Acute intoxication manifests itself in reclusiveness, negative behavior, bizarre statements, sensory sensitivity, and high activity levels. PCP psychosis, on the other hand, is a delayed response to the drug, which can arise as many as four days after actual ingestion. It is characterized by a preoccupation with religious beliefs, paranoia, and extreme violence. Dr. Spodak asserted that Johnson suffered from psychosis, not acute intoxication, when he committed the murder. His opinion depended upon the evidence that Johnson had used PCP "rather heavily every two or three weeks for about four months or so," but had not used PCP in the forty-eight hours preceding the crime. Dr. Spodak further explained that it was difficult to determine when Johnson's psychosis waned because the treating hospitals placed him on strong medications that would have masked any persistent symptoms.

Dr. Spodak questioned whether Dr. Blumberg understood the "pharmakinetics" of PCP and whether he wrongly assumed that a reaction to PCP forty-eight hours after ingestion constituted acute intoxication, rather than psychosis. Moreover, the witness critiqued Dr. Blumberg for attempting to

---

4. Prior to trial in 1984, the State actually consulted with Dr. Spodak about Johnson's case, but he was not called to testify. According to a stipulation provided by the State at trial, Dr. Spodak would have testified that the facts of the case were "compatible with the ingestion of PCP." However, Dr. Spodak did not believe a psychiatrist "could render an opinion as to the defendant's criminal intent at the time of the commission of the offense," nor did he believe, at that time, that a psychiatrist could "render an opinion as to whether or not, in fact, the defendant was intoxicated by PCP at the time of the commission of the offense." He reserved such matters for the trier of fact.

"interpret the *Porreca* opinion and apply it," which was "an overreach for a psychiatrist."

Finally, Johnson called Karceski to the stand. He suggested Stern acted pursuant to Dr. Blumberg's "misinterpretation" of *Porreca* and failed to "digest" the case on his own. He noted Dr. Blumberg's testimony was short and did not include a complete discussion of PCP's differing effects on the human body. Karceski asserted that Dr. Blumberg read *Porreca* to mean that Johnson was not entitled to an insanity defense because he voluntarily ingested the intoxicant. The expert explained, however, "There is absolutely nothing . . . in *Porreca* that indicates, or in any way states, that if a person who intends to use this defense voluntarily ingests a drug, that he cannot go forward with the defense of insanity. In fact, it says exactly the opposite."

Karceski also questioned the withdrawal of the insanity plea so early in the case, before Johnson had availed himself of the opportunity to be evaluated at Perkins Hospital. In his opinion, the evaluation could only have provided the defense with more information about Johnson's mental status, which, in turn, could have bolstered the voluntary intoxication defense. Karceski considered the NCR and voluntary intoxication "consistent defenses," which could have been pursued simultaneously.

In December 1999, by order and written opinion, the post-conviction court granted Johnson a partial new trial on the issue of his sanity at the time of the crime. It ruled that the issue was to be tried under the criminal procedures in place in 1984, which meant the State would bear the burden of proving Johnson's sanity, beyond a reasonable doubt. The court rejected Johnson's request for a new trial on the findings of guilt, given that those findings were affirmed on appeal.

The post-conviction court found, as a matter of fact, that Stern did not discuss the withdrawal of the NCR plea with Johnson. It reasoned as follows:

> Mr. Stern learned of Dr. Blumberg's oral opinion (whatever it was) following the 1:00 p.m. exam on February 22, 1984 or

on the next day. Johnson was incarcerated at that time. Since the withdrawal pleading, which was probably signed by Mr. Stern's secretary, . . . was mailed from his office in Baltimore City on February 24, 1984, Mr. Stern would have had to go to the Baltimore County Detention Center to obtain Johnson's consent during the preceding 36 hours. It is more reasonable to infer, based upon these facts, that Mr. Stern did not discuss withdrawing the plea with Johnson before he took that action.

The court noted that, on its own, this error did not warrant post-conviction relief, but it weighed upon the overarching constitutional question.

The post-conviction court relied heavily upon Karceski's estimation that there was no tactical disadvantage in pursuing an insanity defense alongside a defense of lack of specific intent and premeditation. It referred to *Langworthy v. State*, 284 Md. 588, 399 A.2d 578 (1979), and *Pouncey v. State*, 297 Md. 264, 465 A.2d 475 (1983), for support. Moreover, the court read the trial judge's question of, "Are we going to have a not guilty plea by reason of insanity?" as an invitation "to renew Johnson's insanity plea without abandoning his attempt to negate specific intent."

## II. Discussion

### *Standard of Review*

We recently reiterated our standard of review for appeals of ineffective assistance of counsel claims:

We "will not disturb the factual findings of the post-conviction court unless they are clearly erroneous." But, a reviewing court must make an independent analysis to determine the "ultimate mixed question of law and fact, namely, was there a violation of a constitutional right as claimed." In other words, the appellate court must exercise its own independent judgment as to the reasonableness of counsel's conduct and the prejudice, if any.

*State v. Jones,* 138 Md.App. 178, 209, 771 A.2d 407 (citations omitted), *cert. granted,* 365 Md. 266, 778 A.2d 382 (2001).

## Strickland v. Washington

The Sixth Amendment of the U.S. Constitution guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defense." *See also* Md.Code (1981), Md. Declaration of Rights, Art. 21. In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the U.S. Supreme Court explained that this important right is violated when counsel's performance is deficient, and the deficiency prejudices the defense. The first prong, deficient performance, is judged according to "prevailing professional norms." *Id.* at 688. In that assessment, courts strive "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. The second prong, prejudice, is satisfied when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

*Strickland* has been revisited many times, as defendants have raised it to challenge nearly every aspect of lawyering, casting doubt on actions and omissions alike. We read Johnson's petition as a complaint of Stern's investigation of the psychiatric evidence, which rendered the decision to pursue only a plea of not guilty uninformed and ill-advised. Accordingly, we turn to cases that concern a trial attorney's failure to investigate adequately and prepare a viable defense based on medical evidence.[5] *See generally* Gregory G. Sarno, Annotation, *Adequacy of Defense Counsel's Representation of Crimi-*

---

**5.** A related, but divergent issue is an attorney's duty to investigate and prepare mitigation evidence for the penalty phase of a trial. *See generally Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Wiggins v. Corcoran*, 164 F.Supp.2d 538 (D.Md.2001); *State v. Tichnell*, 306 Md. 428, 509 A.2d 1179 (1986).

*nal Client Regarding Incompetency, Insanity, and Related Issues,* 17 A.L.R.4th 575 (1982, 1995 Supp.).

### *Duty to Investigate an Insanity Defense*

 "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. This is so since, "[b]efore an attorney can make a reasonable strategic choice against pursuing a certain line of investigation, the attorney must obtain the facts needed to make the decision." *Foster v. Lockhart,* 9 F.3d 722, 726 (8th Cir.1993). At no time is this responsibility more important than in a murder case, when "the attorney's duty to investigate all possible lines of defense is strictly observed." *Duvall v. Reynolds,* 139 F.3d 768, 777 (10th Cir.1998) (quoting *Coleman v. Brown,* 802 F.2d 1227, 1233 (10th Cir.1986)).

 Failure to conduct any pretrial investigation constitutes a clear example of ineffectiveness. *See United States v. Gray,* 878, F.2d 702, 711 (3d Cir.1989). On the other hand, an attorney need not expend time and energy on a phantom defense. *See, e.g., Gilliam v. State,* 331 Md. 651, 671–72, 629 A.2d 685 (1993) (no evidence of insanity at the time of the murder); *Harris v. State,* 303 Md. 685, 716–18, 496 A.2d 1074 (1985) (defendant's confession to his attorney rendered further investigation of a supposed accomplice unnecessary). Respect for individual trial technique also means that courts will not second-guess an attorney's decision to forego a weak, only slightly supported defense, for another, more promising one. In *Hinkle v. Scurr,* 677 F.2d 667 (8th Cir.1982), a case preceding *Strickland,* the court upheld counsel's decision to pursue an intoxication defense, rather than an insanity plea, based on the client's representations that he committed the crime while suffering a drinking "blackout." While the defendant in *Hinkle* allegedly had suffered a head injury as a child, the psychiatrist, who evaluated him before trial, conclusively reported that he was competent to stand trial and criminally responsible for his conduct. *Id.* at 670–71.

 Nor is there prejudice in an attorney's decision not to explore what would amount to cumulative evidence. In *Cirincione v. State,* 119 Md.App. 471, 705 A.2d 96 (1998), for example, the defense attorney put Dr. Spodak on the stand to discuss the defendant's mental capacity at the time of the crime, but declined to call three other experts who had prepared reports on the subject. We upheld the maneuver, with the understanding that the experts' testimony would have been cumulative, at best, or confusing and damaging, at worst. Once the attorney "made a valid decision to rely on particular experts for the necessary testimony at trial, counsel was under no constitutional duty to conduct further investigations into the potential testimony of other experts." *Id.* at 493, 705 A.2d 96.

Deference, however, "must not be watered down into a disguised form of acquiescence." *Profitt v. Waldron,* 831 F.2d 1245, 1248 (5th Cir.1987). In *Foster v. Lockhart,* 9 F.3d 722 (8th Cir.1993), the accused defended the charge of rape with an alibi defense. There was also strong evidence that the defendant was impotent and could not have perpetrated the crime. Defense counsel's investigation of his client's impotency ended with a telephone call to one urologist, who explained that an impotent man could still produce sperm. The attorney declined to explore the impotency defense any further for fear that it would "clutter" the trial, be expensive to research, and contradict the alibi defense. *Id.* at 725. The eighth circuit considered that decision substandard, reasoning that further exploration of the medical evidence would have cast substantial doubt on the State's case. Moreover, presentation of an alibi defense did not redeem the attorney's representation, since "[a] tactical decision to pursue one defense does not excuse failure to present another defense that 'would bolster rather than detract from [the primary defense].'" *Id.* at 726 (quoting *Lawrence v. Armontrout,* 900 F.2d 127, 130 (8th Cir.1990)) (second alteration in original).

In *Hill v. Lockhart,* 28 F.3d 832 (8th Cir.1994), the defendant faced trial for murder in Arkansas with an insanity defense. He had a long history of paranoid schizophrenia and

criminal activity, which resulted in incarcerations, hospitalizations, psychological evaluations, and drug therapy in Arkansas and Oklahoma. The records from Oklahoma indicated that anti-psychotic drugs treated the defendant's illness, albeit for the limited time that he maintained the prescribed treatment. The defendant advised his attorneys of the Oklahoma hospitalizations, but they did not seek to obtain them until two weeks before trial. Nor did they introduce any of the records or call to the stand the treating physicians from Oklahoma. Instead, they presented one clinical psychologist, who had interviewed the defendant in jail following his arrest. This psychologist, and a psychiatrist presented by the State, testified about the defendant's history of drug and alcohol abuse.

The court considered the defendant's abandonment of the anti-psychotic drugs an "obvious" defense, and counsel, in its view, clearly missed the mark by not investigating the Oklahoma reports. *Id.* at 842. Indeed, a legal expert testified at the *habeas corpus* proceeding that there was "no 'proper tactical reason'" not to have introduced the medical records. *Id.* at 841. Ultimately, however, the court affirmed the conviction because it could not gamble a reasonable probability that proper exploration of the medical history would have resulted in an acquittal. Likewise, in *Weekley v. Jones,* 76 F.3d 1459 (8th Cir.1996), the court did not find prejudice in counsel's abandonment of an insanity defense, since it was unclear whether evidence of the defendant's history of paranoid schizophrenia would have resulted in a shorter period of confinement. The court also noted that the jury may have been "put off" by the presentment of a not guilty plea alongside an insanity plea. The ultimate results notwithstanding, these cases stand as strong rebukes against counsels' failure to investigate crucial medical evidence.

An important element that weighs against a claim of inadequate investigation of an insanity defense is an attorney's consultation with the accused about the defense. In *Jones v. State,* 600 S.W.2d 189 (Mo.Ct.App.1980), for example, a defendant charged with second-degree murder claimed that his trial

counsel was ineffective when he withdrew an insanity defense. The court, however, accepted the attorney's testimony that he had discussed a pre-trial psychiatric report with his client "several times," and the two "mutually agreed" to withdraw the defense. *Id.* at 191. The defendant also was present in the courtroom when the insanity plea was withdrawn. *See also Weekley,* 76 F.3d 1459 (no ineffective assistance where conflicting testimony emerged as to whether counsel thoroughly discussed the ramifications of an insanity defense with the defendant, and the defendant expressed "complete satisfaction" with counsel at an earlier time in the proceedings); *Lowenfield v. Phelps,* 817 F.2d 285 (5th Cir.1987) (no ineffective assistance where defendant "simply would not talk about the insanity defense," and refused to submit to psychiatric tests arranged by his attorneys), *aff'd,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); *State v. Long,* 192 Wis.2d 762, 532 N.W.2d 468 (Ct.App.1995) (no ineffective assistance where counsel discussed an insanity defense with the defendant, and she rejected it for fear of being thought "crazy").

In Maryland, of course, the law is clear that a defendant who is competent to stand trial holds the power to decide whether to enter an NCR plea. *Treece v. State,* 313 Md. 665, 547 A.2d 1054 (1988); *compare* H. Richard Uviller, *Calling the Shots: The Allocation of Choice Between the Accused and Counsel in the Defense of a Criminal Case,* 52 Rutgers L.Rev. 719 (2000) (reviewing disparate law across the nation). Maryland attorneys, therefore, are obligated to talk with their clients about the withdrawal of an insanity plea. With these legal principles in mind, we return to Johnson's case.

### Analysis

The circuit court found, as a matter of fact, that Stern did not discuss revocation of the insanity plea with Johnson before the withdrawal was completed. We respect that finding, for the reasons provided by the court, and reject the State's characterization of it as clearly erroneous. Like the circuit court, however, we also recognize that that error alone would not justify re-trial of the insanity issue. Indeed, the

error could not have afforded much prejudice since, on the first day of trial, Stern had Johnson state on the record that he was "aware" that the plea had been withdrawn.

To our mind, Stern's failure to communicate with his client about the insanity plea exemplifies his larger error of not investigating an insanity defense. Stern's immediate action upon being retained was to seek a psychological evaluation, a logical step, given the bizarre circumstances of the murder. Then, however, like the attorney in *Foster*, 9 F.3d 722, a telephone conversation with a single doctor led Stern to cut off all investigation of the insanity issue. Assuming Dr. Blumberg stated in the telephone conversation what he said in his courtroom testimony and official report, he would have invoked *Porreca* and expressed the opinion that Johnson was not entitled to an insanity defense because he voluntary ingested the PCP. Dr. Blumberg might even have stated that Johnson had not suffered a settled insanity. But whatever the doctor's conclusions, only Stern was qualified to analyze the medical evidence through the lense of the controlling law, and it was error to forego such an independent assessment. Indeed, given the subject matter, Dr. Blumberg's opinion "triggered [an] obligation to conduct a more complete investigation." *Wiggins,* 164 F.Supp.2d at 559.

It is also true that, while *Porreca* is a well-written opinion, it tackles dense legal principles, not easily digested nor applied. The expanded testimonies of Dr. Crowley in *Porreca,* and Dr. Spodak at post-conviction in this case, demonstrate the complexity involved in analyzing the relationship between PCP ingestion and criminal behavior. And, while Dr. Blumberg focused on Johnson's voluntary ingestion of the PCP, *Porreca* made clear that the determinative factor is the drug's effect on the defendant, whether temporary or fixed, not the manner of ingestion. Dr. Blumberg's trial testimony wavered on this point, as the prosecutor, but apparently not Stern, recognized.

Nor are we persuaded that Stern strategically chose to pursue only one defense to simplify Johnson's case. The uncontested facts left little room for other defenses sometimes

available in first-degree murder trials. Also, the NCR and voluntary intoxication defenses were consistent, and evidence of one would only have buttressed the other. Moreover, Johnson was tried in a bench trial, nullifying the concerns that alternate defenses would have confused or annoyed the trier of fact. In sum, then, to abandon an important avenue of defense, without discussing it with the client, and based upon a doctor's misconception of the law, amounted to error.

As for prejudice, there is a "reasonable probability" that Johnson's case would have been disposed of differently, absent Stern's inadequate investigation of the insanity defense. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. The insanity plea entitled Johnson to a mental evaluation by the Department of Mental Hygiene, which presumably would have included an examination by a psychiatrist, psychologist, and social worker at Perkins Hospital. *See* Md.Code (1957, 1979 Repl.Vol.), Art. 59, § 25; *State v. Thomas,* 325 Md. 160, 166–67, 599 A.2d 1171 (1992) (describing mental evaluation at Perkins Hospital in the early 1980's); *Cirincione,* 119 Md.App. at 486–87, 705 A.2d 96 (describing mental evaluation at Perkins Hospital in 1987). At the very least, then, Stern would have learned more than one expert opinion before he considered withdrawal of the plea. At best, he would have garnished an expert opinion that fully supported an insanity plea, and which sent the State defensively searching out an expert to rebut the favorable opinion. Given the uncertainty surrounding the timing of Johnson's PCP usage, the drug's effect on his system, and the status of his mental capacity following the crime, multiple and varied expert evaluations could only have helped in preparation of the case.

We are cognizant that the trial court touched upon the issue of Johnson's insanity, notwithstanding the lack of a formal NCR plea. Rather than persuade us that the insanity issue was conclusively handled, however, these references only reinforce the significance of the plea's absence. To begin with, Stern apparently did not intend to question Dr. Blumberg on Johnson's sanity at the time of the murder, and, only by the State's questioning, was the specter of *Porreca* even raised.

Moreover, there was no clear discussion of the difference between acute intoxication and PCP psychosis, although Dr. Blumberg employed the word "psychosis" to describe Johnson's condition. Thus, the court never had complete information with which to judge the insanity issue, nor was the issue conceptualized in a contained, logical place. It hung in the air, a bubble reached for and prodded, but never popped. *Compare Wiggins v. State,* 352 Md. 580, 603–605, 724 A.2d 1 (1999) (defense counsel's failure to cross-examine State's lead witness about prior inconsistent statement was negligible given the court's actual knowledge of the inconsistency), *aff'd in part, rev'd in part on other grounds, Wiggins,* 164 F.Supp.2d 538.

Of course, should Johnson have succeeded with an insanity defense, but have been found guilty of the crime, he would have avoided prison, a confinement that "is punitive and hence more onerous than confinement in a mental hospital." *Heller v. Doe,* 509 U.S. 312, 325, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). Having sustained both error and prejudice at the hands of his trial counsel, we are not confident that the trial produced a just result. Therefore, Johnson is entitled to a new trial on the issue of his sanity at the time of the murder.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY GRANTING POST–CONVICTION RELIEF AFFIRMED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY BALTIMORE COUNTY.**