*Ann Currie, as Personal Representative of the Estate of Lance Currie Williams v. State of Maryland*, Nos. 806, 1168 & 2350, Sept. Term 2019. Opinion by Arthur, J.

**CRIMINAL PROCEDURE—ENFORCEMENT OF PLEA AGREEMENTS**

Principles of double jeopardy and due process generally prohibit the State from relying on a mutual mistake of fact to rescind a plea agreement that has been accepted by the court.

In this case, the circuit court accepted a plea agreement under which the State agreed that the defendant was not criminally responsible for two offenses. Two years later, the State asked the court to set aside the plea agreement based on a psychiatrist's opinion that the defendant was, in fact, criminally responsible for his conduct. The court granted the State's motion, concluding that the State could rescind the agreement on the ground of a mutual mistake of fact. In doing so, the court violated the prohibition against double jeopardy as well as due process principles which require (subject to certain exceptions not applicable here) the enforcement of plea agreements previously accepted by the court.

Even if the State could rescind a plea agreement on the basis of a mutual mistake of fact, the doctrine was inapplicable here because the State bore the risk of the purported mistake when it entered into the plea agreement.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

CONSOLIDATED

Nos. 806, 1168, & 2350

September Term, 2019
_____

ANN CURRIE, AS PERSONAL
REPRESENTATIVE OF THE ESTATE OF
LANCE CURRIE WILLIAMS

v.

STATE OF MARYLAND
_____

Graeff,
Arthur,
Battaglia, Lynne A.
   (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Arthur, J.
_____

Filed:  June 30, 2021

In 2017, Lance Currie Williams and the State entered into a plea agreement regarding charges of assault and animal abuse. Williams admitted that he committed the alleged offenses, while the State stipulated that, because of a mental disorder, he was not criminally responsible for his conduct. The Circuit Court for Montgomery County accepted the plea, found Williams not criminally responsible, and committed him for institutional inpatient treatment.

After Williams was hospitalized for a year, an administrative law judge recommended his release. The administrative law judge found that Williams did not suffer from a mental disorder that would make him a danger to himself or others after his release. Even though no party asserted that Williams required continued hospitalization, the circuit court remanded the matter for a new hearing.

Several months later, the State asked the circuit court to "vacate the plea agreement." In support of its motion, the State offered a psychiatrist's opinion that Williams was criminally responsible for his conduct. The court granted the motion, rescinded the plea agreement, and permitted the State to reinstate the charges. The court rejected the contention that the second prosecution violated the prohibition against double jeopardy.

Williams entered a conditional guilty plea, reserving his right to challenge the circuit court's rulings. For the reasons explained in this opinion, we conclude that the court lacked any legal justification for setting aside the plea agreement and the corresponding plea. The convictions and sentences shall be reversed.

FACTUAL AND PROCEDURAL BACKGROUND

**A.    The Underlying Incident**

This appeal comes before this Court after a conditional plea of guilty.  The following summary is largely based on proffers made at the sentencing hearing.

As of February 14, 2017, Lance Currie Williams, then 58 years old, resided with his mother, then 86 years old, at her home in Rockville.  Williams had moved into the home a few years earlier, when his father died, so that he could renovate the home and help care for his mother.

According to his mother, Williams "started act[ing] erratically" at around midnight.  He began "stripp[ing] off all of his clothing," "ranting and raving," "throwing things around the house," and "trashing the common areas of the residence."  He became "verbally abusive" and "started threatening" his mother.  He "pushed her to the ground" and "st[ood] over her naked, with his penis exposed."  He said: "'I'm going to make you feel good.'"

Williams's mother escaped to her bedroom.  When she tried to close the door, he "forcefully pushed the door open[,]" causing it to strike her in the face.  She managed to close the door and to block it with luggage and other heavy objects.  She stayed awake for the entire night to ensure that he would not enter the room.  "[F]or several hours," she "could hear him abusing" the family dog.  She could "hear[] the dog yelp and whine" during that time.

The next day, once she was able to leave the house safely, she sought medical care.  She suffered a "large laceration to her forehead," "severe bruising on her face," and

2

"extensive bruising to both of her arms and knees, consistent with being repeatedly struck [or] grabbed with sustained pressure." At a follow-up visit two days later, she reported the assault to her doctors and to the police.

On February 17, 2017, police officers visited the home to check on the dog's welfare. Williams answered the door, but he refused to allow the officers to examine the dog. The officers ordered him to bring the dog to the door. They observed a "large laceration" on "the back of the dog's neck and collar area." Williams claimed that the dog had been "given back to him" with the injury "after he had the dog microchipped." The officers arrested him and took the dog into custody.

The dog underwent emergency surgery. It had suffered a "gaping irregular laceration . . . resulting in muscle exposure" on the back of its head; two "nickel-sized lesions," which were apparently caused by "prolonged sustained pressure" to the dog's sides; and a "puncture laceration" surrounded by bruises under its right front leg, which was likely "the result of blunt force trauma[.]" The dog also had "foreign wiring material in its stomach," which the treating veterinarian "did not believe was eaten intentionally by the dog."

### B.    Criminal Charges and Competency Evaluations

Upon his arrest, Williams was charged in the District Court of Maryland for Montgomery County with first-degree assault, attempt to commit a sexual offense, aggravated animal cruelty, and related offenses. The district court denied bond.[1]

---

[1] On his initial appearance questionnaire, Williams made the following comment:

When Williams arrived at the detention center, a therapist observed that he "was not oriented to date": Williams said that "it was 1964 and that he was in WWII." The therapist noted that Williams was "responding to internal stimuli" and that he "was repetitive and incoherent at times." Two days later, another therapist tried to examine Williams, but he refused to cooperate. He "made a comment[,] 'They have been doing this for centuries' and rambled incoherently."

A psychiatrist was able to examine Williams on the following day. The psychiatrist described him as "cooperative, oriented to time, coherent and non-bizarre" during the examination. The psychiatrist noted, however, that he "spoke about some conspiracy by his family to contest" the will of a family member. Williams "said it was all a ploy by his machines to take over his property." He denied any history of mental illness and disclosed that he regularly used marijuana before his arrest. The psychiatrist identified three possible diagnoses: "Unspecified Schizophrenia," "Delirium," and "Substance Induced Psychosis."

The district court ordered the Department of Health[2] to examine Williams to

---

DEFENDANT: commissioner is so pretty because she saved sex for when she is older because a woman's promiscuity should be saved for older people, these files are corrupted, sex should be saved for older people, these files are corrupted, sex should be reserved for people that know what they are doing, commissioner's name should be Miranda, loves the world, all women are beautiful, no matter the religion and people that don't beleive [sic] that the Jews dissemnianted [sic] the queen of Sheba who married a Scottish guy[.]

[2] At the time of the initial evaluations, the Department was known as the Department of Mental Health and Hygiene. *See* 2017 Md. Laws ch. 214.

4

evaluate his competency to stand trial. A licensed psychologist, Julie L. Smith, Psy.D., submitted a report on behalf of the Department on February 25, 2017. Dr. Smith concluded that Williams was, at that time, unable to understand the nature or object of the criminal proceedings or to assist in his defense, and therefore was incompetent to stand trial.

Dr. Smith reported that, during her evaluation of Williams, "his mood was labile, vacillating from happy to crying." He made "grandiose statements" and "expressed paranoid delusions . . . and other persecutory beliefs." When asked about his arrest, Williams said that he was "not concerned about the case" and spoke about "genealogy" and other "unrelated topics." He went on to provide "a delusional account of what happened" before his arrest. Specifically, he said that he tried to remove "transmitters" that someone had implanted in the dog. Dr. Smith's initial diagnosis was "Unspecified Bipolar Disorder."[3]

Despite Dr. Smith's report, the district court deemed Williams competent and allowed the case to proceed toward trial. On April 6, 2017, a grand jury issued an indictment charging Williams with attempted second-degree rape, two counts of animal cruelty, and three counts of aggravated animal cruelty. Thereafter, his case was transferred to the Circuit Court for Montgomery County.

The circuit court directed the Department of Health to undertake another competency evaluation. Consequently, Dr. Smith submitted an updated report on June 5,

---

[3] The diagnosis was limited to "conditions which impinge directly on the defendant's competency status."

2017. She reported that, during the second examination, Williams showed "some paranoia but much less" than she had observed previously. Dr. Smith assessed Williams's "insight and judgment" as "improved but still limited." Although her diagnosis was unchanged, she opined that, at the time, Williams was competent to stand trial.

## C. Evaluation of Criminal Responsibility

Through counsel, Williams entered a plea of not guilty and not criminally responsible. Under Maryland law, a "defendant is not criminally responsible for criminal conduct if, at the time of that conduct, the defendant, because of a mental disorder . . . , lacks substantial capacity to: (1) appreciate the criminality of that conduct; or (2) conform that conduct to the requirements of law." Md. Code (2001, 2018 Repl. Vol), § 3-109(a) of the Criminal Procedure Article.

The circuit court ordered the Department of Health to examine Williams to evaluate his criminal responsibility at the time of the alleged offenses. In response, Dr. Smith reviewed police reports and correctional facility records and examined Williams a third time. In a report dated September 16, 2017, Dr. Smith opined that Williams was not criminally responsible for his conduct.[4]

In her report, Dr. Smith wrote that Williams "stated that he has limited recollection" of the incident for which he was charged. He "consistently reported his belief that someone had been in his house" beforehand, "changing the settings on the

---

[4] For the purpose of the evaluation, Dr. Smith assumed that Williams had, in fact, committed the alleged acts.

6

thermostat[,]" rearranging objects in his bedroom, and "tampering with the television, the radio and the clock[.]"

Dr. Smith noted that Williams had used "marijuana on and off for over forty years[,]" to manage chronic pain and insomnia. Williams said that his marijuana use had never caused any negative reactions. On the day of the incident, he was smoking marijuana from a batch that he had been using for the previous month. He believed that someone may have "tampered with the marijuana, perhaps lacing it" with another substance.

When asked about the injuries to the dog, Williams expressed his belief that someone had "drugged the dog" to "manipulate" him into thinking that the dog "was a robot."[5] He suspected that one of his mother's friends might have wanted to retaliate against him for "spending a lot of money two months before it happened on [his mother's] credit cards."

Dr. Smith wrote: "At the time of the offense, Mr. Williams was exhibiting symptoms of psychosis and mania, although what prompted his symptoms is unclear." In Dr. Smith's assessment, Williams exhibited "manic-like symptoms prior to his arrest, such as spending excessive money," and he "presented as very manic when first interviewed" one week later. Although Williams "denied any history of mental health treatment," Dr. Smith reasoned that his symptoms may have been manageable before the

---

[5] Dr. Smith attributed the following statement to Williams: "'The dog appeared drugged. I was being manipulated so I would think he was a robot. They wanted me to think he was a robot. I think the person that came into the house also drugged the dog, too. I saw the wound on his neck and tried to clean him up.'"

7

incident.

Observing that Williams "continued to present with residual symptoms" for "at least four months (February to June)," Dr. Smith concluded that "his symptoms were not necessarily a product of a substance induced mood disorder."[6] Dr. Smith deemed it "[i]nteresting[]" that Williams "ha[d] shown improvement without the need of any psychiatric medications." Yet because of "the amount of time that he presented with symptoms[,]" Dr. Smith thought it "unlikely that his symptoms presentation was solely substance induced[.]" According to Dr. Smith, he "did not appear to be suffering from acute intoxication, but rather prolonged use." Dr. Smith commented that he may have been suffering from "a settled psychosis due to his prolonged use of marijuana."

Dr. Smith identified two possible diagnoses for Williams at the time of the offense: "Bipolar I Disorder, manic, with psychotic features" and "r/o Other (or unknown) substance-induced bipolar and related disorder." Dr. Smith explained that both disorders may be characterized by a manic episode, while the second disorder is "directly caused" by the use of a substance. Dr. Smith characterized the second diagnosis as a "r/o" or "rule-out" diagnosis, meaning that further evaluation was needed before she could either confirm or reject that possible diagnosis.

Dr. Smith concluded, "with a reasonable degree of psychological certainty, that Mr. Williams, at the time of the criminal conduct and because of a mental disorder, lacked substantial capacity to appreciate the criminality of his conduct and could not

---

[6] A substance-induced mood disorder or acute, voluntary intoxication ordinarily would not be grounds for a finding that a defendant was not criminally responsible.

conform his conduct to the requirements of the law." The report ended with a disclaimer, that its conclusions were "based on the information available" at the time. Dr. Smith added: "I reserve the right to modify my opinions or conclusions if new information becomes available that substantially conflicts with the presently available data."

### D.    The Plea Agreement and Resulting Commitment

One day after the parties received Dr. Smith's report on criminal responsibility, the State reached a plea agreement with Williams. The parties agreed to amend the first count of the indictment to a charge of first-degree abuse of a vulnerable adult. Williams agreed to plead guilty but not criminally responsible on that count and on one count of aggravated animal cruelty. The State agreed to enter a nolle prosequi as to the remaining counts.[7]

The parties presented the plea agreement for the circuit court's approval on September 19 and 22, 2017. The prosecutor explained that the State was "not challenging" Dr. Smith's report on criminal responsibility. The court asked for clarification on the terms of the agreement:

> THE COURT: So . . . , he's pleading guilty to these two offenses to admit that he did that?
>
> [PROSECUTOR:] Correct.
>
> THE COURT: However, because he's also pleading [not criminally responsible], and there's a finding of [not criminally responsible] by the evaluator and the State is not opposing that, there will not actually be a sentence imposed but, rather, he would be committed –

---

[7] In addition, Williams consented to a judicial finding under section 6-233 of the Criminal Procedure Article that the offenses were "domestically related."

9

[PROSECUTOR:]  Correct.

THE COURT:  . . . for treatment until such time as he's no longer determined to be a danger?

[PROSECUTOR:]  That is –

[DEFENSE COUNSEL:]  Correct.

[PROSECUTOR:]  -- correct.

The court proceeded to examine Williams regarding his understanding of his plea. Among other things, the court explained that, by entering the plea, Williams was waiving his right to require the State to prove beyond a reasonable doubt that he committed the alleged offenses.  The court confirmed that Williams understood that, because he lacked criminal responsibility for his conduct, the consequences he faced were different from what they would be had he been convicted of a crime.  Specifically, the court confirmed that Williams understood that he would be committed to the Department for treatment until such time as the Department determined that he was no longer a danger to the community.  The court also confirmed that Williams understood that he would be committed for an indeterminate period of time, and that "[i]t could be a short time," or "it could be a long time."

The court found that the plea was free and voluntary.  Williams admitted that he committed the alleged offenses, and the State gave a detailed proffer of the facts that it was prepared to prove.  On those bases, the court found Williams guilty of first-degree abuse of a vulnerable adult and aggravated animal cruelty.

Three days later, when the hearing resumed, defense counsel asked the court to

10

find that Williams was not criminally responsible for his conduct.  The court asked if the State had any objection.  The prosecutor answered, "No."  The court then announced that, "based upon the report and the opinion of the examiner," the court would "find that the defendant was not criminally responsible for the actions which led to these two criminal events[.]"

The court ordered that Williams be committed indefinitely to the Department of Health for institutional inpatient treatment.

### E.      Recommendation for Release

The Department of Health placed Williams at Springfield Hospital Center, where he received constant monitoring, underwent extensive testing, and participated in substance-abuse group therapy.  Six months later, Dr. Geneva Osteen, an attending psychiatrist, recommended that he be released on the condition that he complete a substance-abuse treatment program.

In a report dated March 30, 2018, Dr. Osteen stated that Williams had shown "no signs or symptoms of mood instability or psychosis since admission."  Furthermore, he had "not been on any psychotropic medications."  "To rule out organic causes," Dr. Osteen "ordered labwork[,] which was unrevealing[,] and an MRI[,] which showed no acute pathology."  A neurologist recommended an EEG "to assess for other causes of psychosis," and the results were "within normal limits."  Psychological tests revealed "no mood or psychotic symptoms" but suggested "a diagnosis of narcissistic personality disorder."

Dr. Osteen gave three diagnoses: "Substance-induced psychosis," "Rule out

11

narcissistic personality disorder," and "Marijuana use, severe."  "Given that [Williams] ha[d] no history of mental illness, that the symptoms were brief and remitted on their own without medication, and that he was smoking marijuana at the time of the offense," Dr. Osteen "suspect[ed] he suffered from a substance-induced psychosis."  In Dr. Osteen's "best medical judgment," Williams did not have "a primary mental illness and would not, by reason of a mental illness, be dangerous to himself or the person or property of others if released subject to special conditions of substance abuse treatment[.]"

Three months later, Dr. Osteen submitted an updated report, in which she recommended that Williams "be released from the hospital and **not subject to a conditional release**[.]"  (Emphasis in original.)  Dr. Osteen concluded that Williams "does not suffer from a major mood or psychotic disorder necessitating a conditional release."

An administrative law judge held a release hearing in August 2018.  Dr. Osteen testified at the hearing, subject to cross-examination by the State.[8]  The administrative law judge adopted the Department's recommendation for an unconditional release.

The State filed exceptions to the administrative law judge's report and recommendation.  The State did not dispute Dr. Osteen's opinion that Williams experienced a substance-induced psychosis that had resolved months earlier.  The State nevertheless asked the court to order the Department to conduct "further psychosexual

---

[8] The hearing transcript is not part of the record in this appeal.

12

evaluation testing and treatment before Mr. Williams is considered for release."[9]

Both Williams and the Department argued that the court should uphold the release decision. They contended, correctly, that the court's proper role was to determine whether substantial evidence supported the administrative law judge's decision. *See, e.g.*, *Merchant v. State*, 448 Md. 75, 81 (2016); *Byers v. State*, 184 Md. App. 499, 528 (2009). In the Department's view, the "reality" was that Williams had no mental disorder and no longer met the criteria for continued hospitalization.

The hearing took place before the same judge who had accepted Williams's plea and found that he was not criminally responsible. The judge questioned counsel for the Department at length. He asked why he should ever "rely upon" a mental health diagnosis "rather than saying . . . this person is just vicious and mean and dangerous, so, I'll send him to jail for 50 years." The judge remarked: "I feel hoodwinked by what's happened now." In response, counsel for the Department explained that the evaluation of symptoms is "subjective," that many conditions have overlapping symptoms, that any diagnosis is "fluid" and subject to revision "with the benefit of gathering [additional] information," and that even highly qualified experts can disagree. In short, counsel explained, psychiatry is "not a flawless science."

Although no party had questioned Dr. Osteen's diagnosis, the circuit court said

---

[9] During the judicial review hearing, the State asserted that Dr. Smith's report had "specifically ruled out" a diagnosis of "substance-induced psychosis." Counsel for Williams pointed out that, in fact, Dr. Smith had "never ruled out" substance abuse as the cause of his symptoms. To the contrary, counsel explained, a disorder resulting from substance abuse was "always a rule-out" diagnosis, i.e., a possible diagnosis for which further evaluation was needed.

that it was "not going to accept" the administrative law judge's finding that Williams had no mental disorder. The court announced that it would remand the matter to the administrative law judge for the purpose of "reopen[ing] the hearing to allow the parties to call additional witnesses and permit the State to do an [independent medical examination]."

Williams moved for reconsideration of the remand order. He argued that the State had presented "no valid grounds" for its exceptions. He pointed out that the State had not directly challenged the finding that Williams would not, because of a mental disorder, pose a danger if released. He noted that the State had not requested an independent medical examination. He asked the court to order his immediate release.

During the months that followed the remand order, Williams remained confined at Springfield Hospital Center. He underwent a comprehensive psychosexual evaluation, which indicated that he posed a minimal risk of future sexual violence.

The State selected Dr. Christiane Tellefsen, a forensic psychiatrist, to reevaluate whether Williams would pose a danger, because of a mental disorder, if released. Dr. Tellefsen interviewed Williams in December of 2018 and reviewed records related to the offense and hospitalization.

In a report dated January 10, 2019, Dr. Tellefsen concurred with Dr. Osteen's diagnoses of Narcissistic Personality Disorder and Cannabis Use Disorder. Dr. Tellefsen opined that Williams experienced "a Substance Induced Psychotic Disorder at the time of the offense" and that the disorder "ha[d] resolved." Dr. Tellefsen agreed that Williams was "ready to be released," but thought that he "remain[ed] at risk for reoccurrence of

14

this psychotic disorder with any relapse of substance abuse." Dr. Tellefsen recommended "substance abuse treatment and urine surveillance" as a condition of Williams's release.

### F. The State's Motion to Vacate the Plea Agreement

On February 6, 2019, the State moved to vacate the plea agreement. The State asserted that the plea agreement "was premised upon a mutual mistake of material fact that the defendant was not criminally responsible by reason of a mental disorder at the time of his criminal conduct." In the State's view, the "only appropriate remedy" was "to vacate the plea agreement" so that the State could prosecute Williams a second time. At the State's request, the court stayed any further administrative proceedings regarding the release of Williams.

Opposing the motion, Williams argued that reinstating the criminal case would "flagrantly violate[]" the constitutional protection against double jeopardy. He contended that the mistake-of-fact doctrine, a principle of contract law, was inapplicable to the plea agreement. He further contended that even that doctrine would not permit a party to rescind an agreement where that party relied on a medical diagnosis that was subsequently revised.

On June 5, 2019, the court held an evidentiary hearing on the State's motion. The State offered Dr. Tellefsen as its only witness. Defense counsel argued that testimony and fact-finding were unnecessary. The court disagreed, reasoning that it should determine whether "there was, in fact, an error" before considering "whether or not there was some mutual mistake of fact[.]"

The court accepted Dr. Tellefsen as an expert in general and forensic psychiatry.

15

Based on her examination of Williams in late 2018, Dr. Tellefsen opined that he experienced a substance-induced psychosis at the time of the offenses as the result of voluntary use of marijuana. She explained that "psychiatric conditions that are caused by . . . voluntary intoxication are not, generally, adequate" to support a finding that a person is not criminally responsible. *Accord* Md. Criminal Pattern Jury Instruction 5:05 ("[m]ental disorder does not include mere intoxication by drugs or alcohol"). She opined further that Williams was criminally responsible for his conduct.[10]

After considering the parties' arguments, the court granted the State's motion to vacate the plea agreement. The court acknowledged that, for purposes of the Double Jeopardy Clause, jeopardy had attached at the time when the court accepted Williams's guilty plea. The court nevertheless considered the "contractual concept of mutual mistake." The court reasoned that, if the plea agreement was founded on a mutual mistake of fact, then "the agreement that the parties reached [would] fall[] because of a lack of mutual assent."

The court reasoned further that it had authority to rescind the plea agreement at the State's request if three elements were present. First, the court looked at whether there was a "mistake, as to a basic assumption of the contract." The court said that "clearly" there was such a mistake "because both parties acted on the assumption that the

---

[10] Despite her statement that a substance-induced psychosis generally will not support a finding that a person is not criminally responsible, Dr. Tellefsen acknowledged that "a substance-induced psychosis could lead to a finding of not criminally responsible" in some circumstances. Dr. Tellefsen said that "there are quite a few defendants over the years found [not criminally responsible] whose condition began as a substance-induced state" and "morphed into a different condition" such as schizophrenia.

16

defendant was not criminally responsible." Second, the court looked to whether the mistake had a "material effect on the contract." The court said that the mistake "obviously" had such an effect because "it was the reason why the agreement was reached to begin with."[11]

The third requirement, the court said, was that "the party requesting relief cannot bear the risk of mistake in the contract[.]" In this regard, the court said: "it was not the State who caused this error to occur; the Department of Health and Mental Hygiene . . . issued a report which both parties relied upon[.]"[12]

The court concluded that the parties had made a mutual mistake of fact as to whether Williams was criminally responsible for his conduct. Had the parties known that Williams was criminally responsible, the court reasoned, they would not have reached the plea agreement. Consequently, the court found an absence of "mutual assent" for the plea agreement. On that basis, the court allowed the State to "rescind" the agreement. "[B]oth parties will now go back to square one," the court said.

Based on a "finding that [Williams] does not suffer from bipolar disorder," the court ruled that he did not "need to remain [at Springfield Hospital Center] for treatment[.]" The court announced, "for the purpose of commitment to the Department,

---

[11] In finding a mutual mistake of fact, the court implicitly assumed that Dr. Tellefsen's opinion was correct and that Dr. Smith's was not. The court did not consider whether both opinions fell within the range of reasonable professional judgments that experienced practitioners could draw from the data before them.

[12] The Department of Health is "a principal department of the State government." Md. Code (1982, 2019 Repl. Vol.), § 2-101 of the Health-General Article.

17

I'll find that he's criminally responsible, so, therefore, he's no longer in [the Department's] custody." Defense counsel repeatedly objected, arguing that it was improper for the court to make any findings on the issues of Williams's criminal responsibility or his diagnosis at the time of the alleged offenses.

The court ordered that Williams be transferred immediately to the Montgomery County Detention Center. The court proceeded to set a new scheduling hearing for the criminal case. The court granted the State's request to reinstate the original bond conditions from 2017, under which the district court had denied bond. The court denied "as moot" Williams's pending motion for reconsideration of the order remanding the matter to the administrative law judge for a new hearing.

Within 30 days after the court granted the State's motion, Williams filed his first notice of appeal.

### G.        Denial of Motion to Dismiss on Double Jeopardy Grounds

Shortly after the court reinstated the criminal case, Williams moved to dismiss the indictment, citing the "constitutional and common law protections against double jeopardy." Williams argued that subjecting him to a second prosecution, after the court had accepted his guilty plea, amounted to double jeopardy. Although Williams continued to assert that the court had misapplied the contract-law concept of mutual mistake of fact, he argued that "[t]here is no 'mistake of fact' exception to the double jeopardy rule." He pointed out that the State had identified no authority recognizing such an exception.

Opposing the motion, the State advanced a new theory that Williams had "repudiated his plea of not criminally responsible." The State argued that, even though

18

Williams had not "expressly" asked to "set aside the verdict," he had "violated" the plea agreement "by taking the position that he should be eligible for discharge" on the ground that he "does not suffer from a mental disorder."

At a hearing on August 22, 2019, the circuit court denied the motion to dismiss the indictment on double jeopardy grounds. The court did not endorse the State's theory that Williams had breached the plea agreement. Instead, the court gave the following explanation for its ruling:

> So although double jeopardy does bar subsequent prosecutions of the same case, there are exceptions to that double jeopardy provision and I think I've never seen a case like this in any state that rules one way or the other and I just think this is a case that needs to be dealt with.

> And I think that the facts of this case merit a determination that double jeopardy does not bar the subsequent prosecution because based upon this mistake of fact that the parties, a plea agreement should be set aside and therefore the parties should go back to square one.

One week after the court denied his motion to dismiss, Williams filed a second notice of appeal.[13]

---

[13] An order denying a motion to dismiss an indictment on the ground of double jeopardy is immediately appealable under the collateral order doctrine. *See, e.g.*, *Scriber v. State*, 437 Md. 399, 406 (2014). Thus, Williams's second notice of appeal was a timely notice of appeal from an appealable order. During the proceedings, the parties expressed concern about whether the prior order reopening the criminal case was immediately appealable. Because Williams noted timely appeals from the order denying his motion to dismiss and from the eventual judgments, it is unnecessary to decide whether the first notice of appeal may have been premature. Nonetheless, in civil cases, an order that sets aside an enrolled judgment and reopens a case "is *treated as final* for purposes of appeal." *Davis v. Attorney General*, 187 Md. App. 110, 122 (2009). "The rationale for that well-established principle is that the person who benefitted from the now-vacated enrolled judgment has lost an important right, and therefore an appeal is necessary to vindicate that right, if it was wrongfully lost." *Id.* (citing *Ventresca v. Weaver Bros., Inc.*, 266 Md. 398, 403 (1972)).

### H.    Conditional Plea of Guilty

Four months later, while he was being held without bail pending trial, Williams and the State reached an agreement on a conditional plea of guilty. Williams agreed to enter a conditional guilty plea as to one count of first-degree abuse of a vulnerable adult and one count of aggravated animal cruelty. He reserved the right to appeal the order granting the State's motion to vacate the original plea agreement and the order denying the defense's motion to dismiss the charges on double jeopardy grounds.

The State agreed, once again, to enter a nolle prosequi as to the remaining counts. The parties agreed that the sentences would run concurrently and that Williams would receive a sentence of six years of imprisonment, with all but 10 months suspended, followed by five years of supervised probation. Williams waived his credit for time served, and the State agreed to recommend that he serve the remainder of his sentence at a pretrial release center.

On December 19, 2019, the circuit court approved the conditional plea agreement and sentenced Williams in accordance with that agreement. Within 30 days thereafter, Williams filed his third notice of appeal. This Court later granted his motion to consolidate the three appeals.

Williams died on December 4, 2020. At the time of his death, his appeal had been fully briefed and argued. Upon receiving notice of his death, this Court stayed further appellate proceedings under *Surland v. State*, 392 Md. 17, 36 (2006) (holding that, in criminal cases, "[u]pon notice of the death of the appellant and in conformance with Md. Rule 1-203(d), all time requirements applicable to the deceased defendant and the setting

20

of the case for argument (if that has not already occurred) will be automatically suspended in order to allow a substituted party (1) to be appointed by the defendant's estate, and (2) to elect whether to pursue the appeal"). The Register of Wills for Montgomery County subsequently appointed a personal representative for Williams's estate. The personal representative elected to continue to prosecute these appeals and filed a notice of substitution, and we lifted the stay to allow the appeal to proceed.[14]

## DISCUSSION

In this appeal, Williams asks this Court to reverse his convictions and sentences and to direct the circuit court to enforce the plea agreement that it approved more than three years ago. Alternatively, he asks this Court to vacate his convictions and sentences and to direct the circuit court to dismiss the indictment. In his brief, he presents two questions:

1.    Did the circuit court properly grant the State's motion to vacate the plea agreement?

2.    Did the circuit court properly deny Williams's motion to dismiss the indictment on double jeopardy grounds?

Williams contends that the circuit court erred when it granted the State's motion to vacate the plea agreement. He argues that a mutual mistake of fact is not a valid basis for the State to rescind a plea agreement after it has been accepted by the court. He further argues that the purported "mistake" did not satisfy the elements of that doctrine. Williams contends that the court erred further when it denied his motion to dismiss the

_____

[14] Although the personal representative of Williams's estate is now a substituted party, this opinion continues to refer to the appellant as "Williams."

21

indictment on the ground of double jeopardy. Quoting *State v. Ferrell*, 67 Md. App. 631, 645 (1986), *aff'd*, 313 Md. 291 (1988), he concludes that the State's effort to relitigate the issue of his criminal responsibility "is repugnant to the letter as well as the spirit of the double jeopardy clause."

The Fifth Amendment to the United States Constitution guarantees that "[n]o person . . . shall be subject for the same offence to be twice put in jeopardy of life or limb[.]" This provision binds the states as well as the federal government. *See, e.g.*, *Scriber v. State*, 437 Md. 399, 407 (2014). Although the Maryland Constitution includes no analogous clause, the common law of this State forbids double jeopardy. *See, e.g.*, *State v. Fennell*, 431 Md. 500, 514 (2013).

Double jeopardy violations typically fall into three main categories: (1) a second prosecution after an acquittal, (2) a second prosecution after a conviction, and (3) the imposition of multiple punishments for a single offense. *See, e.g.*, *State v. Frazier*, 469 Md. 627, 640-41 (2020). In addition, double jeopardy principles may preclude the State from relitigating an issue that was determined in the defendant's favor in a prior proceeding. *See, e.g.*, *Butler v. State*, 335 Md. 238, 253 (1994).

A primary purpose of prohibiting double jeopardy is to preserve "'the integrity of a final judgment'" in a criminal case. *State v. Taylor*, 371 Md. 617, 630 (2002) (quoting *United States v. Scott*, 437 U.S. 82, 92 (1978)). Forbidding a second prosecution "serves 'a constitutional policy of finality for the defendant's benefit.'" *Brown v. Ohio*, 432 U.S. 161, 165 (1977) (quoting *United States v. Jorn*, 400 U.S. 470, 479 (1971)); *accord Mason v. State*, 302 Md. 434, 439 (1985). "'Once the trier of fact in a criminal case, whether it

22

be the jury or the judge, intentionally renders a verdict . . . , the defendant cannot later be retried on or found guilty of the same charge.'" *Kendall v. State*, 429 Md. 476, 485 (2012) (quoting *Pugh v. State*, 271 Md. 701, 706 (1974)).

Accordingly, "'as a general rule, [a] prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial'" for an alleged offense. *Mansfield v. State*, 422 Md. 269, 287 (2011) (quoting *Arizona v. Washington*, 434 U.S. 497, 505 (1978)). "[T]he 'Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding.'" *Turner v. State*, 192 Md. App. 45, 80 (2010) (quoting *Burks v. United States*, 437 U.S. 1, 11 (1978)). The State "is not 'allowed to make repeated attempts to convict'" defendants, "thereby subjecting [them] to embarrassment, expense and ordeal and compelling [them] to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent [they] may be found guilty.'" *State v. Taylor*, 371 Md. at 630 (quoting *Green v. United States*, 355 U.S. 184, 187-88 (1957)).

In many criminal cases, the parties disagree about when jeopardy "attaches," i.e., at what point if any during the proceeding a defendant is actually placed in jeopardy. Here, however, the State acknowledges that jeopardy attached when the court accepted the plea of guilty but not criminally responsible during the hearing of September 19 and 22, 2017. *See Sweetwine v. State*, 288 Md. 199, 203 (1980); *Banks v. State*, 56 Md. App. 38, 47 (1983). Moreover, it is undeniable that the second prosecution involved the same offenses as the first prosecution. In fact, the State used a single indictment to secure all

of the judgments in this case.

In sum, the State appears to concede that it placed Williams in jeopardy twice for the same offenses. The remaining issue is whether some exception might authorize the second prosecution even though jeopardy already attached in the case. In search of such an exception, the State has invoked various aspects of contract law.

The Court of Appeals has explained that contract principles have "limited applicability" to plea agreements. *Cuffley v. State*, 416 Md. 568, 580 (2010). Contract principles may "guide the determination of the proper remedy of a broken plea agreement[,]" but those principles alone "are not enough to resolve disputes over the proper interpretation of a plea bargain." *Solorzano v. State*, 397 Md. 661, 668 (2007) (quotation marks omitted). Rather, "[d]ue process concerns for fairness and the adequacy of procedural safeguards guide any interpretation of a court approved plea agreement." *Id.* (citing *Santobello v. New York*, 404 U.S. 257, 261-62 (1971)).

Due process demands that, "'when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.'" *Cuffley v. State*, 416 Md. at 580 (quoting *State v. Brockman*, 277 Md. 687, 694 (1976)). Trial judges are "held to the same standard of fairness" with respect to plea agreements. *State v. Poole*, 321 Md. 482, 496 (1991). Thus, once a guilty plea "is accepted by the court, due process requires" that the court honor the plea agreement. *Solorzano v. State*, 397 Md. at 673. When a "guilty plea rests in part on a promise concerning disposition, and the State or the court violates that promise, 'the accused may obtain redress by electing either to have [the] guilty plea

24

vacated or to leave it standing and have the agreement enforced[.]'" *Cuffley v. State*, 416 Md. at 580-81 (quoting *State v. Brockman*, 277 Md. at 694).

In determining whether a plea agreement has been violated, the court must "construe the terms of a plea agreement according to the reasonable understanding of the defendant" at the time of the plea. *Solarzano v. State*, 397 Md. at 668 (citing *Tweedy v. State*, 380 Md. 475, 482 (2004)). Maryland Rule 4-243(c) requires that all terms of the plea agreement be stated on the record at the plea hearing. This procedure "enables all parties to understand precisely what the agreement is, and it prevents the uncertainty produced by changes of mind based on unstated premises or subjective considerations unknown to some of the parties and unreviewable by the appellate courts." *Banks v. State*, 56 Md. App. at 53.

Williams contends that the State and the circuit court violated their respective obligations. The State induced the guilty plea through its promise not to challenge the Department's report on criminal responsibility. By electing to forego a trial, the State "stipulate[d] to a finding" (Md. Rule 4-314(a)(4)) that Williams was not criminally responsible. The court approved the plea agreement, found a sufficient factual basis to support the plea, and "embod[ied] in the judgment" (Md. Rule 4-243(c)(3)) the disposition under which Williams would be committed for treatment. Two years later, however, the court permitted the State to challenge the stipulated finding and the agreed disposition.

As both parties recognize, there are certain exceptions to the general rule that a court is bound by its acceptance of a plea agreement. Plea agreements are "conditional,

25

the condition being 'the continuing good health of the guilty plea.'" *Banks v. State*, 56 Md. App. at 48 (quoting *Sweetwine v. State*, 42 Md. App. 1, 4 (1979), *aff'd*, 288 Md. 199 (1980)).  Generally, "[w]hether a defendant is entitled to the benefit of the bargain is determined by whether the defendant has fulfilled his or her obligation under the agreement." *Tweedy v. State*, 380 Md. at 487.

Thus, if a defendant repudiates a guilty plea and succeeds in having the resulting conviction set aside, the State may prosecute the defendant on the charges that were resolved by the plea agreement.  *See Sweetwine v. State*, 288 Md. 199, 202-12 (1980).  In those circumstances, "'the original conviction has, at the defendant's behest, been wholly nullified and the slate wiped clean.'" *Id.* at 205 (quoting *North Carolina v. Pearce*, 395 U.S. 711, 721 (1969)).  "'[T]he Double Jeopardy Clause, which guards against Government oppression, does not relieve a defendant from the consequences of [the defendant's] voluntary choice.'" *Sweetwine v. State*, 288 Md. at 211 (quoting *United States v. Scott*, 437 U.S. 82, 99 (1978)).

This Court has recognized additional exceptions in cases of unenforceability, fraud, or material breach.  In *Rojas v. State*, 52 Md. App. 440 (1982), the defendant violated a material term of his plea agreement by opposing deportation, and the State could not require him to abide by that term because it was unenforceable under federal law.  *Id.* at 442-43.  This Court held that the proper remedy for the defendant's breach of the unenforceable term was "to vacate the entire sentence and the corresponding plea agreement." *Id.* at 443.  Our predecessors considered it "unfair to allow [the defendant] to avoid his responsibilities under the plea agreement, yet demand the benefit of the

26

bargain." *Id.* at 445.

Similarly, this Court has held that a trial court may void a plea agreement and vacate the corresponding plea where the defendant "obtained acceptance of a plea agreement by fraud or materially breached any of its terms[.]" *Falero v. State*, 212 Md. App. 572, 585 (2013). We explained: "We cannot justly force the court to give [the defendant] the benefit of his bargain when he purposefully did not live up to his end." *Id.* at 593.

Absent such an exception, however, a defendant is entitled to have the plea agreement enforced after it has been accepted by the court. For instance, in *Banks v. State*, 56 Md. App. 38 (1983), the trial judge accepted a plea agreement calling for a maximum prison sentence of 10 years for second-degree murder. *Id.* at 44-45. Later, the judge refused to abide by the sentencing term because he learned that the defendant had two prior convictions for serious offenses. *Id.* at 45-46. The judge required the defendant to withdraw his plea or else subject himself to a sentence exceeding the agreed-upon maximum. *Id.* at 46.

In the ensuing appeal, this Court explained that there was no basis "which, on the facts of th[e] case, could justify the trial court's action in repudiating [its] commitment to the plea agreement[.]" *Banks v. State*, 56 Md. App. at 51. Neither the defendant nor his counsel made misrepresentations or deliberately withheld the information about his prior convictions. *Id.* at 50. When the terms of the plea agreement were stated on the record, those statements "contained [no] hint that any particular state of [the defendant's] prior criminal record was a term or condition of the agreement." *Id.* at 53. This Court

concluded that the trial court violated the defendant's right not to be placed twice in jeopardy. *Id.* at 54. Consequently, our predecessors directed the trial court to reinstate the guilty plea and to enforce the plea agreement that the court had previously accepted. *Id.*

In this appeal, the State contends that Williams "unintentionally . . . breached" what the State calls "his obligation to abide by the [not-criminally-responsible] finding in the plea agreement[.]" The State's argument has things backwards. In the plea agreement, the State obligated itself to abide by the finding that Williams was not criminally responsible. The State also bound itself to accept the disposition under which Williams would be committed indefinitely to a mental health facility instead of receiving a sentence of incarceration. Despite its obligations, the State returned to court two years later, offering new evidence that Williams was criminally responsible and seeking to incarcerate him for those offenses. It is difficult to imagine a more direct violation of the State's obligations.

Williams, by contrast, fulfilled his obligations to the State. Under the plea agreement, he promised to plead guilty but not criminally responsible to two counts. He did so. He has never retracted that plea.

Moreover, Williams did not contradict his representation that he was not criminally responsible by seeking his release on the ground that he would or "would not be a danger, as a result of mental disorder . . . , to self or to the person or property of others if discharged." Md. Code (2001, 2018 Repl. Vol.), § 3-114(b) of the Criminal Procedure Article. The inquiry into whether a defendant is responsible for criminal

28

conduct depends on the defendant's capacity "at the time of that conduct[.]" *Id.* § 3-109(a). When Williams adopted the Department's recommendation for discharge, neither he nor the Department took any position regarding his criminal responsibility at the time of the offenses, because that issue was no longer of consequence. Williams had no obligation to oppose his attending psychiatrist's recommendation that he be unconditionally released.

Even a factual finding that Williams experienced a substance-induced psychosis during the offenses does not necessarily contradict the legal conclusion that he lacked criminal responsibility. Defendants may be found not criminally responsible based on evidence that their drug use resulted in a "settled" disorder. *See State v. Johnson*, 143 Md. App. 173, 179-81 (2002). A "settled" disorder "results from 'continued or persistent use [of intoxicants],' and exists 'even after the chemical agent was no longer present in the individual's blood stream.'" *Id.* at 180-81 (quoting *Porreca v. State*, 49 Md. App. 522, 528 (1981)). "It is not necessary" that the settled condition be "permanent or incurable" for the defendant to be found not criminally responsible. *Porreca v. State*, 49 Md. App. at 527. Here, Dr. Smith's report on criminal responsibility noted that Williams's symptoms persisted for months and stated that he may have experienced "a settled psychosis from prolonged use of marijuana."[15]

---

[15] "Substance/medication-induced psychotic disorder may at times persist when the offending agent is removed, such that it may be difficult initially to distinguish from an independent psychotic disorder." American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 114 (5th ed. 2013). "Cannabis-induced psychotic disorder . . . usually remits within a day but in some cases may persist for a few days." *Id.*

In addition to fulfilling his plea obligations, Williams also fulfilled any obligations regarding the disposition. He agreed to be committed to the Department of Health for institutional inpatient treatment. He was, in fact, placed in the custody of the Department for two years and treated by psychiatrists at Springfield Hospital Center. The State, however, insists that Williams "agreed" to "receive mental health treatment" for "the diagnosis that rendered him [not criminally responsible]," which, according to the State, was "bipolar disorder." The State asserts that Williams can no longer fulfill that promise because his physicians have determined that he does not have that disorder.

Contrary to the State's assertions, the agreement did not require Williams to maintain any particular diagnosis or to undergo any particular treatment. Even if a plea agreement could impose those types of conditions, this one did not. The plea agreement appropriately entrusted Williams's post-commitment diagnosis and treatment to the Department of Health. "Absent a specific term of the agreement" imposing additional conditions on a defendant, the "sanction" for failing to meet the State's unstated expectations "may not be repudiation of the plea bargain." *Tweedy v. State*, 380 Md. at 487.[16]

When the circuit court ruled in the State's favor, the court declined to adopt the

_____

[16] Echoing its "breach" argument, the State argues that a "critical part of the plea agreement" became "unenforceable" when the Department's physicians ruled out the diagnosis of bipolar disorder. Quite simply, treatment for bipolar disorder was not a term or condition of the agreement. The entire agreement is not only enforceable, but it was duly enforced until the moment that the court rescinded it. The State's gripe is that specific enforcement would inevitably lead to an outcome that the State dislikes: eligibility for release under the standards that govern the release of committed persons.

theory that Williams had breached the plea agreement.  Rather, the court relied on the doctrine of mutual mistake of fact.  The State argues that the court was correct in doing so.

The State quotes the following proposition: "Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake[.]"  Restatement (Second) of Contracts § 152 (1981).  To invoke this remedy, "[i]t is not enough for [the adversely affected party] to prove that he would not have made the contract had it not been for the mistake."  *Id.* § 152 cmt. c.  The party "must show that the resulting imbalance in the agreed exchange is so severe that he can not fairly be required to carry it out."  *Id.*  In this context, a "mistake" is defined as "a belief that is not in accord with the facts."  *Id.* § 151.

In moving to vacate the plea agreement, the State asserted that the agreement "was premised upon a mutual mistake of material fact that the defendant was not criminally responsible[.]"  The circuit court found a "mutual mistake" regarding the "fact" of whether "at the time [of the offenses], the defendant was criminally responsible[.]"  On appeal, the State asserts, somewhat differently, that the "mistake that warrants rescission of the plea agreement . . . was the parties' mutual belief that Williams had a mental disorder that rendered him [not criminally responsible]."

Williams contends that the doctrine of mutual mistake of fact is broadly inapplicable to plea agreements.  He cites statements from *Banks v. State*, 56 Md. App.

31

38 (1983), expressing doubt about whether certain grounds for rescinding an ordinary contract could justify rescinding a plea agreement. As recounted earlier, the State in that case bound itself to a lenient sentence before learning that the defendant had additional prior convictions. *Id.* at 45-46. In dicta, this Court remarked: "In a contract setting, some argument might be made on the basis of either innocent material misrepresentation of fact or unilateral mistake of fact, but . . . the rigid application of contract law principles is not appropriate in plea agreement cases." *Id.* at 50.

Although the *Banks* Court did not reach the issue, Williams cites a number of cases in which other courts have rejected the prosecution's attempt to rescind or reform a plea agreement under the doctrine of mutual mistake of fact. *See United States v. Ritchison*, 887 F.3d 365, 369 (8th Cir. 2018); *United States v. Transfiguracion*, 442 F.3d 1222, 1228-30 (9th Cir. 2006); *United States v. Atkinson*, 979 F.2d 1219, 1223 (7th Cir. 1992); *United States v. Olesen*, 920 F.2d 538, 541-42 (8th Cir. 1990); *United States v. Partida-Parra*, 859 F.2d 629, 633-34 (9th Cir. 1988); *see also United States v. Barron*, 172 F.3d 1153, 1158 (9th Cir. 1999) (rejecting government's attempt to rescind plea agreement based on mutual mistake of law). The prevailing rationale is that, in light of the constitutional principles that govern plea agreements, "it would be inappropriate to extend the application of ordinary contract law principles so far as to permit the government to claim the defense of mutual mistake." *United States v. Transfiguracion*, 442 F.3d at 1229.

Seeking to evade this line of authority, the State cites *United States v. Frownfelter*, 626 F.3d 549 (10th Cir. 2010). In that case, the court rejected the government's attempt

to void a plea agreement based on a purported mutual mistake of fact about whether one of the offenses charged in the indictment was a felony. *Id.* at 555-57. The court determined that the government failed to satisfy any of the three elements needed to apply the doctrine. *Id.* at 555. The court did "not reach th[e] issue" of the appropriate remedy for a mutual mistake of fact "because the government ha[d] not shown" that the doctrine was satisfied. *Id.* at 556. *Frownfelter* is unhelpful to the State here.

The State also cites cases in which the court permitted a defendant to rescind a plea agreement on the basis of a mistake of fact. *See United States v. Williams*, 198 F.3d 988, 993-94 (7th Cir. 1999); *United States v. Lewis*, 138 F.3d 840, 841-43 (10th Cir. 1998). *But see United States v. Zweber*, 913 F.2d 705, 711 (9th Cir. 1990) (holding that defendant could not withdraw from a plea agreement based on a mutual mistake of law). As Williams observes, however, the State cites no case in which the court allowed the prosecution to rescind a plea agreement based on a mutual mistake of fact. He implores this Court not to become the first.

We share our predecessors' skepticism toward the "rigid application of contract law principles . . . in plea agreement cases." *Banks v. State*, 56 Md. App. at 50. Although we are not bound by decisions of the federal appellate courts, the State "ha[s] not provided us with any legally cognizable reason to depart from th[e] approach" taken by those courts. *Amin v. Superior Court*, 188 Cal. Rptr. 3d 870, 877 (Cal. App. Ct. 2015) (discussing federal cases refusing to allow prosecutors to rely on mutual mistake of fact to excuse performance of a plea agreement). Ordinarily, once a court has accepted a valid plea agreement, the court may not rescind the agreement at the State's request on

33

the ground of a mutual mistake of fact. We see no reason why this ordinary rule does not prevail here.

In addition to arguing that the doctrine of mutual mistake of fact is broadly inapplicable to plea agreements, Williams contends that the doctrine is not satisfied here. He argues that a party's belief based on an incorrect medical diagnosis "is not a mistake of fact under Maryland law."

In support, Williams cites *Bernstein v. Kapneck*, 290 Md. 452 (1981). In that case, the parent of a five-year-old child, relying "primarily on the medical diagnosis by and prognosis of [the child's] doctors," agreed to a monetary settlement of a claim for personal injuries suffered by the child in an automobile accident. *Id.* at 454. The parent executed a contract releasing the defendant from liability for all claims "on account of bodily injuries, known and unknown, and which have resulted or may in the future develop, sustained by [the child]" as a result of the accident. *Id.* at 454-55. After the enrollment of a consent judgment, the child developed additional symptoms as a result of injuries sustained in the accident. *Id.* at 455. The parent petitioned to "set aside both the . . . release and judgment" on the ground that both resulted from "a mutual mistake of fact." *Id.* The trial court denied the petition, concluding that incomplete knowledge of the extent of the child's injuries did not "constitute[] a mutual mistake of the variety" that would justify rescinding the release. *Id.* at 456.

The Court of Appeals concluded that, under those circumstances, the parent made "no showing that a mutual mistake of fact existed." *Id.* at 463. The Court criticized out-of-state cases in which courts "permit repudiation by a releasor when unanticipated

34

injuries surface" after the execution of a release. *Id.* at 456. The Court observed that those courts "attempt to justify the result they reach by an utterly inappropriate application of the mutual mistake of fact doctrine to factual circumstances which not only do not present a mutual misconception of basic fact, but often do not appear to involve a mistake by even one party." *Id.* at 461-62. In other words, "the 'mistake' found is the fact that the parties did not know the extent of the injuries suffered, notwithstanding that the releasor expressly assumed the risk (as parties to all contracts inevitably do) of the lack of omniscience as to what might develop in the future, by an express release of all unknown claims." *Id.* at 462. The Court rejected this approach as an "unprincipled" application "of the well-founded principles concerning mutual mistake of fact." *Id.*

The State cites no authority supporting its position that a psychiatric opinion that is later disputed may give rise to a mutual mistake of fact. The State nevertheless asserts that *Bernstein v. Kapneck* "is plainly distinguishable" because "both parties" to the release in that case "received precisely what they bargained for." The State tells us that the plaintiffs in that case "were simply unhappy because they could have received *more* damages than they initially sought had they not bargained away that right." According to the State, it "bargained for Williams to be committed for treatment under the State's supervision, but instead Williams was approved for unconditional release."

These purported distinctions are unpersuasive. The State's assertions ignore the reality that Williams was, in fact, committed to the Department of Heath for institutional inpatient treatment. When it entered into a plea agreement with Williams, the State bargained away its rights to require him to prove that he was not criminally responsible

35

and to seek the imposition of a sentence. The State might feel dissatisfied that the Department recommended an unconditional release after what the State considers to be a short time. Nevertheless, that outcome is a distinct possibility whenever a person is committed. *See* Md. Code (2001, 2018 Repl. Vol.), § 3-114(b) of the Criminal Procedure Article. That possibility was simply part of the bargain that the State reached.

Williams further contends that, even if the allegedly incorrect psychiatric opinion resulted in what might properly be characterized as a mutual mistake of fact, the State is not entitled to rescind the plea agreement, because the State "b[ore] the risk of the mistake[.]" Restatement (Second) of Contracts, *supra*, § 152. Generally, "a contracting party takes the risk of most supervening changes in circumstances" and "many mistakes as to existing circumstances even though they upset basic assumptions and unexpectedly affect the agreed exchange of performances." *Id.* § 154 cmt. a.

"A party bears the risk of a mistake when

(a) the risk is allocated to him by agreement of the parties, or

(b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or

(c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so."

*Cuesport Props., LLC v. Critical Devs., LLC*, 209 Md. App. 607, 623 (2013) (quoting Restatement (Second) of Contracts, *supra*, § 154).

Williams contends that, under these formulations, the State bore the risk of a mistake resulting from its reliance on the Department's report on criminal responsibility.

36

Williams observes that the State had no obligation to accept Dr. Smith's diagnosis or the conclusion that Williams was not criminally responsible. Instead, the State could have required Williams to "establish, by a preponderance of the evidence, the defense of not criminally responsible." Md. Code (2001, 2018 Repl. Vol.), § 3-110(b) of the Criminal Procedure Article. Thus, the State could have insisted that Williams call Dr. Smith, cross-examined her about the hedged and equivocal statements in her report, and argued that Williams had not discharged his burden and that the jury should find that he was criminally responsible. Moreover, the State might have sought to have a psychiatrist other than Dr. Smith evaluate whether Williams was criminally responsible. Instead, the State "stipulate[d] to a finding" that Williams was not criminally responsible. Md. Rule 4-314(a)(4). Contrary to the State's assertions, a prosecutor is not "at the mercy" of the Department of Health.

The circuit court appeared to misapprehend Williams's argument that the State bore the risk of a mistake. When it addressed that issue, the court said, "it was not the State who caused this error to occur; the Department of Health and Mental Hygiene . . . issued a report which both parties relied upon[.]" The court incorrectly conflated the concept of risk allocation with the question of fault. *Compare* Restatement (Second) of Contracts, *supra*, § 154 (discussing "When a Party Bears the Risk of a Mistake"), *with id.* § 157 (discussing "Effect of Fault of Party Seeking Relief").

Making a similar conceptual error, the State insists that it did not bear the risk of a mistake because it was "relying on an expert's reasoned diagnosis." But the reasonableness of a mistake by no means precludes a finding that the party voluntarily

37

assumed the risk of a mistake. For example, in *Bernstein v. Kapneck*, 290 Md. at 455,

doctors had treated the child for "at least a year" and concluded that she had "suffered

only" a few specific injuries. *Id.* at 453-54. The child first developed symptoms of

another disorder only after the settlement. *Id.* at 455. The trial court found that the

parent "had exercised reasonable diligence in attempting to ascertain the full nature and

extent of [the child's] injuries prior to entering into the settlement[.]" *Id.*

Notwithstanding that the parent had relied on an expert's reasoned diagnosis, the parent,

by agreeing to a release, "assumed the risk . . . of the lack of omniscience as to what

might develop in the future[.]" *Id.* at 462.

Dr. Smith's report, on which the State relied, forthrightly acknowledged more than

a trace element of uncertainty. In addition to the diagnosis of "Bipolar I Disorder," Dr.

Smith identified a rule-out diagnosis of "Other (or unknown) substance-induced bipolar

and related disorder." Dr. Smith acknowledged that "what prompted [Williams's]

symptoms" at the time of the offense was "unclear." She noted that Williams had no

reported "history of mental health treatment" and that he "show[ed] improvement without

the need of any psychiatric medications." She opined that his actions were "*not*

*necessarily*" the "product of a substance induced mood disorder." (Emphasis added.)

She added that it was "*unlikely* that his symptoms presentation was *solely* substance

induced." (Emphasis added.) Although Dr. Smith expressed her ultimate opinion "with a

reasonable degree of psychological certainty" that Williams was not criminally

responsible, the report explained that its conclusions were subject to "modif[ication] . . .

if new information bec[ame] available that substantially conflict[ed]" with the

information available at the time.

Any reasonable reader of the report would recognize that the author had reasonably accurate, but imperfect, knowledge regarding Williams's mental condition at the time of the offenses. The State, when it chose to rely on the conclusions in the report, chose to treat its limited knowledge as sufficient. Under the doctrine of mutual mistake of fact, "rescission is not available" where, as here, "the purported mistake 'relate[s] to one of the uncertainties of which the parties were conscious and which it was the purpose of the compromise to resolve and put at rest.'" *Amin v. Superior Court*, 188 Cal. Rptr. 3d at 878 (quoting *Harbor Ins. Co. v. Stokes*, 45 F.3d 499, 502 (D.C. Cir. 1995)) (further quotation marks omitted).[17]

In summary, we perceive no valid justification for the result reached by the circuit court. Broadly speaking, principles of double jeopardy and due process generally prohibit the State from relying on a mutual mistake of fact to rescind a plea agreement that has been accepted by the court. Additionally, even if the State could rely on a mutual mistake of fact to rescind such an agreement, the State was not entitled to rescind

---

[17] In yet another attempt to justify the rescission of the plea agreement, the State alludes to the doctrine of "frustration of purpose." The State fails to elaborate on its proposed application of that doctrine. In any event, for a party to be entitled to relief under that doctrine, "'the frustration must be such that the intervening event cannot fairly be regarded as within the risks the frustrated party assumed under the contract.'" *United States v. Frownfelter*, 626 F.3d at 554 (quoting *United States v. Bunner*, 134 F.3d 1000, 1004 (10th Cir. 1998)). Here, the State assumed that risk that Dr. Smith's opinion might be incorrect.

the agreement in this case, because it bore the risk of the purported mistake.[18]

**CONCLUSION**

The Circuit Court for Montgomery County erred in purporting to rescind a plea agreement that it had accepted and placing Williams in jeopardy a second time. The judgments later entered as a result of Williams's conditional guilty plea must be reversed. His original plea of guilty and not criminally responsible must be reinstated. He is entitled to the disposition to which the State and the court originally bound themselves.

> **JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY, ENTERED ON DECEMBER 19, 2019, REVERSED. ORDER OF THE CIRCUIT COURT, ENTERED ON JUNE 5, 2019 (DOCKET ENTRY #125), REVERSED. COSTS TO BE PAID BY MONTGOMERY COUNTY.**

---

[18] According to Williams, a change in a psychiatric diagnosis can never give rise to a mutual mistake of fact because "psychiatric opinions and diagnoses are *not* objective facts, but always involve clinical judgment." In the State's view, the issue of whether Williams actually had bipolar disorder is one of fact, even though an expert opinion was "the *basis* for the . . . erroneous belief" that he had the disorder. In view of our disposition of the case, we need not decide whether a psychiatric opinion or diagnosis is a "fact" in the same way that it is, for example, a "fact" that the cow in *Sherwood v. Walker*, 66 Mich. 568 (Mich. 1887), was pregnant and not barren.

40